# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 22, 2010

## JUAN MARKEITH COLLIER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-829     Cheryl Blackburn, Judge**

---

**No. No. M2009-02246-CCA-R3-PC - Filed February 28, 2011**

---

Petitioner, Juan Markeith Collier, pled guilty to aggravated kidnapping and attempted second degree murder, both Class B felonies, and was sentenced to concurrent sentences of eleven years. The eleven-year sentence for aggravated kidnapping was required by statute to be served at one-hundred percent. In this appeal from the denial of the post-conviction petition, Petitioner asserts that his guilty plea was involuntary because trial counsel and two "loved ones" coerced him into accepting the plea. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

James O. Martin, III, Nashville, Tennessee (on appeal) and Chad Hindman, Nashville, Tennessee (at trial) for the appellant, Juan Markeith Collier.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

## I. Background

At the plea submission hearing, the Assistant District Attorney general gave the following information as a factual basis for the plea:

[I]f the case were to go to trial, the state would bring evidence to establish that on the 25th of November, 2006, at around 8:00 o'clock in the morning that the suspect, Mr. Collier, and the victim, Ms. Maeshi (phonetic) Woods, were sitting on the bed in her apartment. And they began an argument where they were calling each other names. A physical altercation ensued from that point where Mr. Collier placed his arm around Ms. Maeshi Woods' neck and began to choke her. She was able to break free, and the altercation continued outside the bedroom where once again he put his hands around her throat and began to strangle her again. She was able to bite the suspect and got free at that point. The altercation moved downstairs where the - - where both parties ended up struggling down the stairway. And at the bottom of the steps Mr. Collier once again grabbed the victim and threw her against the wall and began to strangle her. At that point she began to lose her consciousness. And when she did regain her consciousness, the defendant was on top of her. And he eventually loosened his grip. She was able to get up. She attempted to leave to go get some air, and the defendant blocked her from leaving to get some air out of her front door. And then she headed towards her back door, and the defendant placed his body up against that exit also. And he eventually allowed her to get some air once she agreed that she would not contact police.

She, in fact, did contact the police and went to the hospital that day. And at this point in time when this attack occurred she was somewhere between eight and nine months pregnant. She delivered the baby the next day. And the next day the baby did suffer some fetal distress. And that was not [the] pre-established delivery date for the baby.

## II. Post-Conviction Hearing

Trial counsel testified that he was initially appointed to represent Petitioner in general sessions court. He was present for the preliminary hearing and cross-examined the witness. After Petitioner was indicted, trial counsel requested and received discovery from the State, and he spoke with the assistant district attorney general numerous times about the case. Trial counsel testified that he reviewed Petitioner's file and the discovery, and he spoke with the victim. He reviewed all of the information with Petitioner before the guilty plea.

Trial counsel testified that he frequently met with Petitioner to the "point where I would go and sit and we'd look at each other, because we really had nothing else to talk about." Trial counsel and Petitioner thoroughly discussed the case, and counsel went over all of Petitioner's options. The victim was nine months pregnant at the time of the offenses, and trial counsel said that he reviewed the medical records associated with her pregnancy. He was aware that the victim went into premature labor as a result of the assault.

Trial counsel "vividly" remembered conversations with Petitioner surrounding the guilty plea. He advised Petitioner that one of the sentences would be served at one-hundred percent, which he thought that the trial court also mentioned in the plea submission hearing. Trial counsel testified that the State's initial offer was fourteen years rather than eleven. At some point, Petitioner rejected the State's offer, and the case was set for trial. Trial counsel testified that he was not sure what changed Petitioner's mind. He said:

> I think his trial approached and he didn't really get a better offer. Or maybe he thought that, you know, if we'd pushed it up to trial, we'd get a better - - I know that Ms. Jackie Willey, who's here today, had some prior connection with him in his past and she did speak with him, as well, you know, and gave him her opinion about what he should do. But, you know, I had to make sure it was his decision. I told him, you know, if you want to go to trial, we'll go to trial. But my advice to him was to accept the plea bargain.

Trial counsel felt that based on the facts of the case, Petitioner would receive a "lot worse sentence at trial." He said that the only defense Petitioner offered was that he was not a bad person, and Petitioner wondered why the State did not offer him a better deal. Trial counsel told Petitioner that he was not "going to trial on his character, he's going to trial on the facts. And the facts of the case were pretty indefensible."

Trial counsel testified that Jackie Willy knew Petitioner from when he was in State's custody, and Petitioner wanted to talk with her on the day of the plea. Ms. Willy was familiar with the facts of the case and told Petitioner that he should probably accept the plea offer. Trial counsel testified that he also advised Petitioner to take the deal; however, it was Petitioner's decision. He did not recall Petitioner's girlfriend being present at the time. On cross-examination, trial counsel testified that he did not believe that anyone else was present when he reviewed the plea petition with Petitioner.

Petitioner testified that he was in a room outside the courtroom on March 28, 2008, for a status hearing on his trial that was set for April. He said that trial counsel asked him again about the plea offer of "eleven at a hundred percent." Petitioner testified that trial counsel also said "something about eleven, eighty-five, being that they would take fifteen percent off of the back end of the plea or the sentence. So I really wasn't trying to take that offer." He said that trial counsel then allowed Ms. Willey, who he had met in a group home, to speak with him and "try to persuade [him] into taking a deal." Petitioner testified that he became emotional and his head "began to cloud up." He said that Marvina Marsh, the mother of his son, was also there pushing him to take the deal. Ms. Marsh had told him that she spoke to trial counsel and that Petitioner did not have a chance of winning the case.

Petitioner testified that as a result of being pressured by Ms. Willy and Ms. Marsh, and being encouraged by counsel, he accepted the plea. He also said:

> I really - - I was really feeling forced into taking the deal because, honestly, I felt like that the representation wasn't being, you know - - I wasn't being represented to my fullest then, so I was thinking that maybe if I didn't then, you know, I would receive more time, not because of what - - what I had going on, but because of my attorney and also I took the deal because everybody being in the room. It was just as if - - like they were ganging up on me to take the offer. And so I - - I, like, gave in, because, like I said, my head was - - I was just really clouding in judgment and very emotional. And so in a way, I really wasn't - - you could say, I really wasn't thinking clearly.

Petitioner testified that he had been abandoned as a child by his parents, and he had been diagnosed as bipolar and as having a mood swing disorder.

On cross-examination, Petitioner testified that he understood the crimes that he was pleading guilty to and the sentence that he would receive. He was aware that the sentence would be served at one-hundred percent. Petitioner felt that he was not properly represented by trial counsel because he later learned that he had a favorable defense because the medical reports indicated that his actions did not cause the victim to go into premature labor. Petitioner claimed that he wanted to go to trial and only pled guilty because trial counsel "had a team of loved ones" that counsel knew would have an "impact on [him]" to accept the plea. He admitted that he gave trial counsel permission to discuss his case with Ms. Willy, and he requested to speak with her. However, he did not want her to pressure him into accepting the offer. Petitioner said that he wanted Ms. Willy's and Ms. Marsh's opinions about accepting the plea, but they began "hounding" him. Petitioner admitted that he told the trial court that no one threatened him into taking the plea.

Jackie Willy testified that she was a former employee of Williamson County Youth and was the clinical director at My Friend's House. Defendant was there for a year, and they formed a close relationship. Ms. Willy was aware that Petitioner was in jail, and trial counsel called her. Trial counsel informed her that Petitioner would likely be convicted of the charges against him, and he was facing a twenty-five year sentence. He also told her that Petitioner had been offered a plea of eleven years that he did not want to accept. Ms. Willy then offered to talk with Petitioner.

Ms. Willey testified that she went into the room with Petitioner and trial counsel. Petitioner's girlfriend was also present. They were in agreement that Petitioner needed to accept the plea. Ms. Willy testified that they told Petitioner that he basically had no chance

of winning at trial. She said that Petitioner was upset and could not believe what was happening to him; however, he was not dazed or "out of it." Ms. Willy admitted that she was crying during the conversation, and Petitioner's girlfriend was also upset. She felt that she was doing something right by trying to convince Petitioner to take the plea. Ms. Willy also said that Petitioner wanted to go to trial because he did not feel that he would be convicted.

On cross-examination, Ms. Willy testified that she first went in and talked to Petitioner alone. She said:

> Just told him that to think about what he was doing, that he would be - - if he was convicted and got twenty-five years, that he would be forty years old when he got out. That if he took the plea, that he would be - - I think I said twenty-seven, as I recall, or something like that. But that he would just be a lot younger, you know, that it would - - it would just be in his benefit to take this deal if he was going to get twenty-five years. I recall I kept saying, think about it, eleven years, twenty-five years, eleven years, twenty-five years, which do you want to do? You're going to have to do something, which do you want to do?

Ms. Willy testified that she had always talked sternly to Petitioner, but she did not think that she forced him to accept the offer. She said: "I think that with all three of us talking to him, I felt like we finally convinced him that it was the best thing for him to do." However, she said it was ultimately Petitioner's "call and his decision."

## III.  Standard of Review

Petitioner contends that because of trial counsel's failure to investigate possible defenses and pressure from Ms. Willy, Ms. Marsh, and trial counsel, he had no choice but to plead guilty instead of going to trial.

In a claim for post-conviction relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. Petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *Grindstaff v. State,* 297 S.W.3d 208, 216 (Tenn. 2009). The post-conviction court's factual findings "are conclusive on appeal unless the evidence preponderates against those findings." *Jaco v. State,* 120 S.W.3d 828, 830 (Tenn. 2003). Upon review, this court will not reweigh or reevaluate the evidence below, and all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial court, not this court. *Momon v. State,* 18 S.W.3d 152,156 (Tenn. 1999).

On appeal, the post-conviction court's findings of fact are entitled to substantial deference and are given the weight of a jury verdict. They are conclusive unless the evidence preponderates against them. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). A post-conviction court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). Our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact, ...; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief based on the alleged ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient, and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result would have been different. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. *See Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (citing *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)). As stated above, in order to successfully challenge the effectiveness of counsel, Petitioner must demonstrate that counsel's representation fell below the range of competence demanded of

attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Under *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Petitioner must establish: (1) deficient representation; and (2) prejudice resulting from the deficiency. However, in the context of a guilty plea, to satisfy the second prong of *Strickland*, Petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and the State standard set out in *State v. Mackey*, 553 S.W.2d 337 (Tenn.1977). *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In *Boykin*, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, our Tennessee Supreme Court in *Mackey* required an affirmative showing of a voluntary and knowing guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. *Pettus*, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. *Pettus*, 986 S.W.2d at 542; *Blankenship*, 858 S.W.2d at 904.

Petitioner in this case has failed to show that trial counsel was deficient or that but for counsel's alleged deficiencies, he would have refused to plead guilty and insist on going to trial. Concerning this issue, the post-conviction court noted that Petitioner had "made a blanket statement assertion that his counsel did not represent him to the fullest extent and should have done more to defend him." The court further noted that the most specific statement that Petitioner had made about trial counsel's representation was that he believed that his "mental reports were favorable to him and that [t]rial [c]ounsel should have done further research on that issue." The post-conviction court also specifically accredited trial counsel's testimony concerning his preparation for the case. The court pointed out that during the plea colloquy, the Petitioner acknowledged that he had thoroughly discussed his case with trial counsel and that he was satisfied with the work trial counsel had done on his case.

Concerning Petitioner's allegation that he was pressured into accepting the plea by Ms. Willy, Ms. Marsh, and trial counsel, the post-conviction court noted that although Petitioner felt forced into taking the plea, he conceded that he was not threatened. During the plea colloquy, Petitioner told the court that he had not been threatened into taking the

plea. The post-conviction court found that Ms. Willy was giving petitioner her advice as to what was in his best interest and essentially accredited her testimony that it was "ultimately Petitioner's choice as to whether or not to accept the plea offer."

The record supports the post-conviction court's findings. Trial counsel was present for the preliminary hearing and cross-examined the witness. He also requested and received discovery from the State, spoke with the assistant district attorney general numerous times about the case, reviewed Petitioner's file and the discovery, and he spoke with the victim. He then reviewed all of the information with Petitioner before the guilty plea. Trial counsel and Petitioner met frequently, thoroughly discussed the case, and trial counsel went over all of Petitioner's options.

Trial counsel "vividly" remembered conversations with Petitioner surrounding the guilty plea, and he advised Petitioner that one of the sentences would be served at one-hundred percent. The State's initial offer was fourteen years rather than eleven. Trial counsel felt that based on the facts of the case, Petitioner would receive a "lot worse sentence at trial." He said that the only defense Petitioner offered was that he was not a bad person, and Petitioner wondered why the State did not offer him a better deal. Trial counsel told Petitioner that he was not "going to trial on his character, he's going to trial on the facts. And the facts of the case were pretty indefensible."

Petitioner wanted to speak with Ms. Willey and specifically asked for her advice concerning the plea offer, and she gave it to him. She told Petitioner that he basically had no chance of winning at trial, and she felt that she was doing something right by trying to convince Petitioner to take the plea. Although Ms. Willy testified that she had always talked sternly to Petitioner, she did not think that she forced him to accept the offer. She also said that it was ultimately Petitioner's "call and his decision" to plead guilty.

We conclude that Petitioner has failed to show by clear and convincing evidence that he received ineffective assistance of counsel or that his guilty plea was involuntarily or unknowingly entered. Petitioner is not entitled to relief in this appeal.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____

THOMAS T. WOODALL, JUDGE